Sherman v. Abengoa Good morning, your honors. May it please the court, Andrew Love for the appellant. This is an appeal in the dismissal of a complaint alleging violations of the Securities Act and the Exchange Act. And if I may, I'd like to focus on the Securities Act claims and in particular the statement that Abengoa adhered to a percentage of completion method of recognizing revenue, which required recording actual costs incurred as a percentage of total estimated costs of the entire contract. The complaint plausibly alleges how the company violated this method of accounting by falsifying the actual costs. And they did this by recording costs on projects from unrelated projects and recording costs that had not yet incurred on those projects. And so by doing that, they could then, under this percentage completion of percentage method, prematurely recognize revenue. I think we understand the theory. I guess the issue is what could or should the district court or a district court rely on when assessing whether you've stated the claim. And that's actually not an easy question. It seems to me the circuit has not been crystal clear on this and district courts have a little bit all over the place as to where you can go to get your facts. So you've got a number of different sources that you've identified as, I guess, initials and numbers. And then you've also got a KPMG report, an ICAC report, which in some cases are just lifted completely from court cases. Yes. And I guess that's really the question maybe we should start with. Like, under, after, well, under Lipsky from this court, and I guess Lorelei, which seems to create some tension, what is, what's out of bounds? I'll ask you after the same question. Your view is that you can consider anything from any source, even if you've never met or can't even really identify the person? Okay, well, just take that first before I go to documents. There are seven confidential witnesses in this case. There's one confidential whistleblower, which counsel was not able to interview, but. Which we don't really know where he works, right, or what exactly his role was. I mean, we can infer it from the detail that is in his letter, anonymous letter. He seems to have a great deal of knowledge about accounting in advance. Right, but if that were posted on YouTube or Facebook, that would be sufficient? Well, here it's a confidential. I know what it is. I'm saying. So, same thing. Exact same letter. It's posted on Facebook. You get to rely on it, and the court has to consider it? I think you can rely on it if it's corroborated, certainly if it's corroborated by other witnesses. And here we have these six other witnesses that were all interviewed by counsel. And there's a substantial overlap with that, with the confidential witness and the other confidential witnesses. Both the methodology of accounting and the use of double books and the use of particular projects, both in Ukraine and Kenya, where he describes, he or she describes, unrelated costs recorded on those projects. And then we have FE4, I believe, who describes the exact same projects. So does it matter that, so could, following up on my colleague, could the FE7 statements be on Facebook? I mean, if sufficiently corroborated, or is it important, the context in which FE7 statements appear? I think as long as counsel has vetted witnesses whose statements overlap and corroborate, and then we also have, then I think, yes, that can be considered. I mean, we're at the pleading stage, and so it's, if the allegations are plausible. And here, given the details that were given in terms of what happened with these accounting problems, and the consistent stories of different witnesses from not just the one subsidiary that FE7 talks about, but the other ones in the United States that talk about the same exact use of double books. Right, but what they don't say is the scope of it, and that scope is necessary to show that this was material. Yes, and I think that's where the documents come in. And so we have an audit report from KPMG that was commissioned by Avangoa, and we have these other documents, the resolution from the ICOC. Well, just before we get to the documents, I mean, I guess you would also say that if you have FE7 talking about the double books and the accounting practices, then you have a lot of other employees from different parts of the company corroborating that. It's true that they're talking about a lot of different individual places within the company, but all of that, you think, might suggest that it was pervasive. Yes, and certainly at the pleading stage, plaintiffs were entitled to inferences, and the inference from various witnesses who all talk about the same improprieties is that there was a widespread accounting fraud going on. But so without FE7 and without the documents you're going to talk about in a minute, do you think you have enough already? It's a harder case, for sure, but if we're just relying on the other witnesses. FE1 through 6. Through 6. Yes, I think we have a much stronger case. All right, well, if this confirms, at least we've got our finger where it ought to be at this point. FE4 and FE5, especially FE5, who was the project manager of the Mecca Medina, this massive project, who describes the same things that the KPMG report talks about, which is he reviewed the budget for three years and found unrelated costs going to that project, and so that's consistent. But in terms of the, I mean, KPMG, it's an audit report commissioned by Abengoa. There's no question about its content. I mean, defendants for both the ACAC report as well, and then there's also an audit by Silva Associados, which I think in the briefs got somewhat conflated with the ICAC report, but that was also, its findings were also cited by the national court. There's no question about the content that the way these were referred to in the court filings in Spain accurately characterized what these findings were. And so we have, you know, KPMG is a reputable firm that found this invoice triangulation scheme, among other things, that resulted in, at least in 2012, inflated earnings for an inexpensive of 50 million euros. And it, and the ICAC report, which talks about more globally Abengoa, talked about recording, Abengoa recording expenses, I guess in that, in that it was, they sanctioned Deloitte for certifying financial statements that overstated profit margins on a particular project by $218 million. I don't think there's any dispute about what it says. I mean, I don't think so anyway. But the issue is, is it out of bounds, right? So it's all because it's part of a court, a court document, right? Sure. And if it were in a news report or if it was on YouTube, it still could be used. Well, that's what I guess I'm asking, right? I mean, we have, in Lipsky, it's an SEC complaint, right? The SEC, one would presume that's a public entity. I think in Lipsky, though, I mean, that's been distinguished because that had to do with a consent decree and there were admissibility issues. Well, this one doesn't even have a consent decree. This is, I mean, you don't have to. Right, so it wasn't confidential. There wasn't like an admissibility problem. I mean, here we have, I mean, in Lorelei, the court talks about the, it's fine to use SEC findings, especially when there's overlap with other witnesses. And here, that's exactly what we have. I mean, the KPMG report describes the same circumstances that FE5 talks about. And in the lower courts, there's Bear Stearns, which relies on a study from another case. So, again, your argument is it all turns on corroboration. So the fact that you've got a bunch of witnesses who sort of say kind of the same thing is enough then to make these things that can be relied on. But if it was just the KPMG report alone, would that be enough? That has, yes. Yes, okay. Can I focus on the falsity of the statement? So the statement says they used the percentage of completion method. Yes. So I take it the argument for why that's not true is that the company booked revenue when it was projected, and as the thing was completed, they didn't revise those numbers. They kept them on the books. Part of the reason why is they needed lots of approval to revise the numbers, and they ended up with two sets of books, right? One that kept the inflated estimates on the books and one that corrected them. Is that part of the argument for why it's not following the percentage of completion? Part of it was the two sets of books, but the other part of it was hiding losses from earlier projects and trying to inflate margins for those projects by incurring costs either early or on completely unrelated projects. Well, I guess I kind of have this question, and maybe there's an easy answer to it, which is if they have these two sets of books, one of which is accurate and one of which is not, they are both – if the internal books are actually applying the percentage of completion method and the allegations show that within the company they sometimes ask to know the Excel numbers as opposed to the SAP numbers, aren't they in some sense using the percentage of completion method even if one set of the books are not updated properly or not completely accurate? Allocations are that those were used by the project managers, the accurate ones, but that the inaccurate ones were the ones that were given to auditors and to the public. Right, so for the purposes of your Exchange Act claim, then maybe even those books being given to auditors are itself a misrepresentation. But for the Securities Act claim, it has to be the statement in the registration statement that is misleading, right? And so the statement that has to be misleading is we use the percentage of completion method. So if in fact everybody knows they have two sets of books, one might be more loyal to the percentage of completion method and the other one might require eight levels of approval before it gets updated and so on. Is it false to say the company is using the percentage of completion method when in fact they have that set of books? It is false because everyone within the company, they were using two sets of books, but not everyone outside the company. And the falsity comes from the financial numbers that they were giving to their auditors. So the statement in the registration statement that says we use the – maybe this is a fair inference. We use the percentage of completion method, we should understand it as being we give those numbers to the auditors and that's our external facing method. Is that right? I'm sorry. So the statement in the registration statement doesn't just mean we use the percentage of completion method in some sense. You're saying that's actually the numbers that we provide to the public and to the auditors and so on. Exactly. And it's beyond just the two sets of books. It's also this invoice triangulation scheme and then the ICIC resolution and the Silva audit, they all talk about inflating profit margins, hiding losses. And one thing I do want to point out though about this method, the percentage of completion, one of the reasons the district court rejects the falsity issue is because there are risk warnings within the statement that talk about, well, we use estimates and judgments with this in terms of this method. But the estimates and judgments just have to do with the estimated total costs part of the equation. And it has nothing to do with the actual costs. And it is the actual costs that we allege are being falsified here. Well, you put projections early on in the method, right? And then as you actually complete the project, you revise those to become more accurate. Right, in terms of the estimates. So there are estimates, right? Yes, there are estimates in terms of how much is, you know, what would be the total cost of this project. And then what the allegations are is that instead of using the actual costs to get, to show you're at a certain stage of the project to be able to recognize revenue, they would use costs from other projects or costs that hadn't been used yet so they could then recognize revenue. That's the allegation. Can I ask about the statute of limitations question? Yes. So if in November, what is it, November of 2014, you're on notice that the company is understating its exposure to debt, why doesn't that put you on notice that you should investigate the books and maybe the profits are going to be misleading as well because they're being misleading about showing their financial position? The November 14 disclosure was pretty narrowly focused just on this debt misclassification issue and had nothing to do with any other accounting methods. I wouldn't have given a reasonable investor any indication that there was anything else beyond just debt misclassification that was going on. And it wasn't until... Well, the investing public was pretty alarmed by it, right? They were very much alarmed by it. By 50% or something to that effect, right? Yes. So why wouldn't you say, well, I can't trust the books of this company and so I'm going to do an investigation as to whether it's using accurate accounting methods? Because it seemed pretty focused on one aspect. And so what is it about the August 2015 disclosures that puts you on notice? I mean, it doesn't tell you that they're having inaccuracies in the books or they're not using the percentage of completion method. It just tells you that their revenue is not what the books seem to reflect, right? It says more than the problems with Abengoa's about misclassifying debt. That all of a sudden it is about phase where all of a sudden they need this huge capital raise. And as Bloomberg said, this was an unexpected announcement that eroded trust in Abengoa's accounting methods. And a reasonable investor at that time, arguably those finalist storm warnings have sort of come to a point where that would lead to inquiry notice and start investigating and interviewing witnesses. Okay, but you're saying a reasonable investor in November 2014 would say, well, they have a funky definition of non-recourse debt, but that wouldn't lead them to investigate other aspects of their accounting? The duty to inquire is triggered by information that relates directly to the misrepresentation. And there's nothing that you could say that directly would lead you to think that they're mucking about with the completion of percentage method. Well, not everybody who's recharacterizing their debt is engaging in a triangulation process that has them basically booking expenses for projects in future projects, right? That's your point, isn't it? Yes, yes. In other words, debt is about, there might be multiple companies that have this funky view of debt, but not all of them are engaging in a scheme like this. That's right. And it's completely unrelated to the mischaracterization of debt. It's a completely different scheme. I mean, a general sense that this is not a trustworthy company is not what we have found to be enough to put you on inquiry notice. Exactly. Thank you. Good morning. May it please the court, my name is Jeffrey Rotenberg. I'm from Clark-Smith-Villazor, Counsel for the Pele-Avangoa. So in my colleague's presentation, I think there was one point that I didn't hear that I want to emphasize for the court, and that's that the Third Amendment complaint's theory of falsity, theory of material falsity, is premised on, and this is a quote, a widespread systemic accounting fraud within Avangoa. So the amended complaint, the Third Amendment complaint, creates a framework where they've acknowledged to show a violation of percentage of completion and a misstatement about that, a material misstatement about that in Avangoa's disclosures. You'll have to find that they've sufficiently played this massive scheme across the entire company, and I think Judge Ramos in his comprehensive review of the complaint and opinion found that they were nowhere near reaching that level. And I'll jump to the topic. Because he discounted certain entire categories of information. Well, I think he, Judge Ramos, and I was going to jump into this because I know you want to hear about it, Judge Ramos found that the borrowed, he called them borrowed allegations from the foreign proceedings that were unproven did not have to be treated as well-plaid facts and given the benefit of the doubt and benefit of the truth. But he also then proceeded to actually look at the documents, look at the reports, and found that they were lacking, woefully lacking in the specificity on several levels that would be required to establish this widespread systemic accounting fraud scheme across Avangoa. And I'll jump to Judge Sullivan's question to my colleague. I mean, is that the right method for the district court to apply to look at each individual witness and each individual statement and say, well, this person is at this part of the company and only has limited knowledge and this person is at that one? Should he take a step back and say, well, I have witnesses or, you know, confidential informants from all sorts of different places of the company and therefore it's a plausible inference that this was systemic? Well, I think you have to look at it, and I think you did this. I think you have to look at each one individually and then collectively as you would do typically with Sienta, though the analysis, I guess, is a little different. So I think Judge Ramos, and I think we lay it out in our brief, I think we do the same thing. You look at each one. You see what they say. You see where they are in the company. You see the basis. For example, I think it's FE1 and FE either 2 or 3. He found more than even credible to have the information they were saying. It was all secondhand. I think it was an HR person. But is that right? I mean, FE1 was based on hearsay, right, but it was a human resources person who talked to an internal auditor. Was it right to say I'm just going to set those statements aside? I think so because there's no context to what she was told. I mean, it's not a trial, but it's hearsay. There's just no context, and I think that's a broader problem with a lot of the documents that my colleague was referring to that are in the TAC, the Third Amendment Complaint, that are not actually in the record. They're quotes of quotes, right, meaning it's multiple layers. It's quotes from documents or alleged reports. But there's no hearsay rule in meetings, right? No, right, yeah. That's why I was making an analogy. Right, I mean, you could, but it's a question of to what extent. Well, these are identifiable people. I mean, this wouldn't be hard to depose these folks. Right, if you're talking about FE1, right, so FE1 was told that people were told things, that I think someone used an expletive to respond to an employee. If you have somebody explaining what the accounting practice is that the company is following, and you have a bunch of other people in the company say, well, I heard the same thing from this person, like there's chatter in the company about the same problem existing in other parts of the company, doesn't that corroborate the first person who explained what the accounting practice was? It starts to corroborate the issue that they're talking about, right? So what you have to do, and I think Joe Dromas did it well, and I think we do it in our brief, is you have to break down who's corroborating what about what. For example, I don't think there's a dispute the company had a dual accounting system. So it's not surprising that multiple people commented on that. But sort of I think the primary points of focus, the so-called invoice triangulation, is talked about in the KPMG report and by FE7. FE7 came first, and the KPMG report, I believe, was a response to FE7. So you have, not to be trivial, but a 0 plus 0 equals 0. You have two sort of unverified, unchecked, in one case really unknown, impossible to know, person who wrote a letter seven years ago. And that's really the guts of the Third Amendment complaint, and that ultimately is where I think Judge Ramos found and we believe is the problem and just confirms that they can't get past what they need to get past. But then you've got FE5 who says, yeah, this is what went on in Turkey and with a particular project, the Mecca Medina project. And then you've got FE6, who's not even at the company, but he says, you know, I was asked to basically produce invoices for stuff that had nothing to do with the project it was getting booked on. Doesn't that corroborate FE7? It corroborates a piece, potentially, of what FE7 said around that project. But, again, if one drills down and looks closely at each of the reports, each of the documents or alleged documents, I guess they're documents, the alleged statements in the documents and what's in the Third Amendment complaint and get granular, there are just insufficient well-plaid facts to blow up into the widespread systemic fraud across the company. And there's also a lack of, you know, when we're talking about a fraud, we're talking about a mental state. We're talking about fraudulent intent. And, you know, my colleague, Mr. Radin, will speak about the one named defendants, Sienta, in a few moments. But other than that, there's no other named defendants. There's a reference to one executive in 2012 in an e-mail that he wrote. But other than that, there's no – I think Jadramus used the word connective tissue. There's no connective tissue here. So the reason you're saying that you need to show widespread company-wide is because of the Sienta requirement? No, plaintiffs – excuse me, appellants say it in the Third Amendment complaint. The complaint says – I've read it many times, and I believe the briefs say too – the basis for the allegations that the percentage of completion method and how that's disclosed is – Well, yeah, I understand. But really what allows them to set a claim is if they can show that the statement in the registration statement was misleading. Right. Or for the Exchange Act claim that some other statement was misleading. And so if they somehow didn't go far enough to plausibly allege the whole thing was completely widespread, but they did go far enough to show that it was misleading, they still stood a claim, right? So I'm asking why you're saying the standard is whether they've shown that it's a company-wide – I'm saying because that's what they say. Meaning they've set up the Third Amendment complaint that – and I think they say it in their brief that these are examples and these are just examples, and the examples alone are indicative of this widespread scheme, which, when you bring it back down, means the statements are false. Right? The premise that, for example, the company tried to enforce strict financial discipline, which they say is actionable. The reason why they say that's allegedly false is because there was this widespread systemic scheme across the company. So, again, I'm responding to, and we respond in our papers, and I think Judge Ramos says it in his opinion, to what's alleged in the complaint, which is all we can do. And that's the basis that appellants assert for why these statements are false, entirely false. Did you get to the KPMG report? I mean, so why is that one out of bounds? Well, the KPMG report has similar issues. I don't believe we've seen the full KPMG report. I don't believe it's in the record here. But do you need to see the whole report before you can rely on it? I mean, it's – Rules of completeness for pleadings? Well, what I think it is, at this point, it's an information in belief. And I think you mentioned, Your Honor, the Lorelei decision, and there – I got reversed on that one. I still remember. Someone told me not to mention it because of that, but I mentioned it. I take my chances. The Lorelei decision, you know, it's an SEC order, right? And so the court said the SEC order on its own isn't helpful. And here the KPMG report is – I don't even think it rises to that point. Well, the SEC is a litigant, right? They were participants in an adversarial proceeding, basically, and so it had been unverified and ultimately was not something that was treated just like sort of pleadings. But to the extent that it reported something from KPMG, or you had aspects of a KPMG report, it might have been a different story. Well, I think it's hard to know. It's impossible to really, without seeing the whole report, to understand what it's saying. And I think that's borne out, and we filed a letter this week with the courts with this new opinion in Seville that came down that found the KPMG report – it rejected the KPMG report and dismissed that proceeding, which is a really core part of the Third Amendment complaint too. It dismissed that proceeding and found the KPMG report was, you know, not reliable. But is that a factual dispute? Doesn't that suggest that maybe you win, but it doesn't mean that their pleadings are implausible? Well, no, because I think, Your Honor, that the KPMG report already was borderline more than information and belief because they're bringing out quotes in an opinion from a foreign court. And now, based on that ruling, there's even further reason, if not absolute reason, to question the information in the report and the reasonable basis of arguing that any rulings, certainly in the Seville case previously, and even in the Madrid case, the preliminary decisions there that have allowed the case to proceed to the investigatory phase, are worth relying on here. And just to come full circle to the original question Judge Sullivan asked my colleague, you know, it's a Rule 11 issue to a point. The case is in the district court, and there are a lot of cases in the district court that talk about this issue because it's come up a lot, apparently. It comes a lot up in the district court. I remember well. Yeah, so it seems to be coming up a lot. The trend, for what it's worth, does seem to be in the direction that, you know, these allegations are not relied on in the PSLRA. They're just insufficiently played under the standards that govern a securities pleading such as here. So what should be the rule? Maybe we need to clarify it. It seems to me the district courts would like us to clarify. I'm not sure Lorelei or Lipsky really do a great job of that. So what should be the rule? I mean, and my defense lawyer hat on. I think the rule should be under the PSLRA and Rule 9b, you need particularized pleadings, and you layer on Rule 11, I think you need to have some firsthand knowledge. So you have to have had coffee with the guy. You have to have looked him in the eye. You have to have done some direct verification of what you're relying on, whether that means having an investigator talk to the person or someone, you know, firsthand knowledge. If the anonymous witness was someone who was in the Canary Islands and a plaintiff's counsel in Spain, I've spoken to him or her, and a plaintiff's counsel in New York spoke to that plaintiff's counsel, maybe you're closer, but the idea that you can have an anonymous person who knows who they are, where they are, submit a document, and that become the basis for a federal securities fraud claim under the PSLRA and 9b, that can't be the rule, and I'm pretty sure it's not. We rely on anonymous persons sometimes for a criminal complaint for probable cause when corroborated. Sorry, I didn't. I mean, we rely on anonymous persons in the context of criminal proceedings on a regular basis if sufficiently corroborated. I mean, why wouldn't the rule be it depends on the surrounding tissue of what supports what the anonymous and corroborates what the anonymous person says, and all we know, all we can infer from what's in the information about who the anonymous person or where the anonymous person might be situated. Right, so I think if you have- I'm just saying, aren't there circumstances- Yeah. Blanket rule seems to me a little draconian. Well, there could be, and I think if you were noticed cleaning land, maybe it would be different also, right? But we're talking about the PSLRA and the heightened requirements that are designed and were passed by Congress to protect people from fraud claims, and so I think in this context, extra layers of protection are sort of called for by the rules. Happy to answer anything else. Can you do the identity of some of the confidential witnesses? Would that change it because you're saying the anonymity is the problem? Well, to me, based on the cases I've read, anonymity for FE7 is game over. On the other ones, I think, you know, counsel has said they've spoken to them. I think you have to analyze each one. I think the rule on this is more clear in the circuit. You have to analyze each one, their role in the company, and then assess what they say. And again, just to get past this initial point about borrowed allegations, I think if you actually break down what they say, as Judge Ramos does, they're individually and collectively lacking the specificity to establish the material falsity of the financial statement. So again, Judge Ramos did both things in his opinion, and I think we do both in our brief. There's the borrowed allegations, to what extent should you credit them and give them the full treatment? And B, even if you do, what does that mean for the third amendment complaint and what they've alleged here? So I think it's two pieces, and I think Judge Ramos was right on both of them, as we lay out in our brief, and you could, you know, affirm on either one or both. But just so I'm clear, the borrowed allegations are FE7, KPMG, ICAC, and- So the stuff that's quoted, to me, the stuff that's quoted in- Anything that came out of the Spanish complaints. Yes. Thank you. Thank you. Good morning. Steve Radin from Waelach and Manjis, representing Manuel Sanchez Ortega. My time is short. I'm going to just join in what my colleagues have said before and after on the no misstatement and time bar issues. I'm going to devote the bulk of my time to the question of Sienter, and in particular with respect to my client. Let me just, before I get to that, just say on the KPMG report, if you look at pages four and five of the submission that Mr. Rotenberg made earlier this week, the court in Spain tells you exactly what the KPMG report was and wasn't, what information it did not have access to, and we don't even have a copy of the report. We have allegations about the report. It's now been rejected by a court on the ground that KPMG did not have access to essential information. With respect to- You're saying we should rely on that most recent ruling, which postdates the briefing, as really the basis to kick out that report. We don't have to do even all the sort of fine definitions that will be perhaps useful in later cases because this is an easy one. That's what you're saying. This is an easy one on this ground, but again, we're talking about a report that there's nothing in the record about the report. Somebody said something about it, and we now have the benefit of the court in the very case the plaintiff is relying upon saying that it was just a report that didn't consider all of the information. KPMG, through no fault of its own, didn't have access to certain documents, et cetera, that the court in Spain has now seen. On Sienta, the appellants must allege Sienta with respect to Mr. Sanchez Ortega. I'm not going to tell you what TELAPP says. You know that. It's not a question of inferences, as Mr. Love said in his argument. We need strong inferences. They have to be cogent, compelling, et cetera. There are three striking facts about Mr. Sanchez Ortega. First, the plaintiffs argue that this fraud, alleged fraud, was masterminded by Abengoa's founder and executive chairman in e-mails. The e-mails are not copied to Mr. Sanchez Ortega. They're not addressed to him. They don't mention him. Second, very important point, not one of the seven confidential witnesses, FE1 to FE7, says anything linked to Mr. Sanchez Ortega. Third, and I think most important— Well, they do say that it was a well-known practice, right? I mean, can you infer that the head of the company would know something if everybody at the company knew something? I'm not sure he was the head of the company. He was the CEO of a company that had an executive chairman who was also the founder. This was a company spread out over, I think, six continents, 50 countries, tens of— So even if it was well-known to people within the company, he still wouldn't know? And so you have to have allegations that say that he specifically knew. Is that your position? Or some report. These courts' cases say that there has to be some report, some document that shows that he had access to information that was at pretty low levels of the company. This was a very, very large company. The third point— Not enough to say the buck stops there. He's the boss. You've got to have some— You've got to have— That's not the basis for fraud. It may be a basis for other things, but it's not a basis for fraud. So he's not on the e-mails. He's not identified directly by the FEs. What else have you got? And the most important thing is this individual held close to a million shares of Avangoa stock worth millions of euros. If he had been involved in a fraud and if he was leaving the company, as they say, because he was involved in a fraud that was about to be exposed, he would have known that those shares were going to plummet in value, and he would have gotten rid of them. He didn't. He didn't sell one single share even after he left Avangoa. Well, he left the company and then took over to BlackRock, and then BlackRock shorted the company, right? No, no, no. That is— Okay, so tell me what's— I want to come to that because that's an argument that the plaintiff added in their reply brief. It wasn't in their opening brief, so we didn't address it. He left the company. The plaintiff admits in the reply brief on page 35 that there's a much more benign explanation, that he had heart surgery. This was in both of their first two complaints. They took it out of their third complaint, but the court's allowed to look at the entire record. He left. He had heart surgery. He wanted a quieter life. He took a job in BlackRock. That is correct. The plaintiff's reply brief makes it sound as if he had—they used the word responsibility for strategic matters in this huge company. The record is quite different. JA-261-64 shows you that at Avangoa, Mr. Sanchez Ortega oversaw 27,000 employees. I mean, aren't you just sort of disputing the facts? So, like, maybe there is a benign explanation for him leaving the company, and there's a benign explanation for BlackRock's investment decisions and so on. But, like, isn't that a merits question? No, you have to—to show scienti, you have to allege some factual basis. Okay, he—at BlackRock, what I was about to say on JA-768, he oversaw a unit in Latin America with 26 people, 0.0001 percent of what he oversaw at Avangoa. There was—there's no evidence whatsoever that he was linked, involved in any of the trading. One of the Spanish court proceedings that the plaintiff ignores found that he didn't. It's in the record. I don't have the site, but it's in the joint appendix. The Spanish court found that he resigned to change his lifestyle. I told the district court, docket 114 to 23, that Mr. Sanchez Ortega's unit at BlackRock was so immaterial to BlackRock, his bottom line, that I was unable to find a single reference to that unit in any BlackRock public filing. Mr. Love never contested that. We're not going to weigh your arguments and weigh your facts at those things. Your point is that there's nothing in the pleadings that would suggest he had any role in the BlackRock shorting decision, right? That is correct, yes. And they have to do that to create a strong inference of Sanchez. Yes, and they don't even—this is such a non-issue, they don't even mention the BlackRock shorting in either of their briefs. In their reply brief, they throw in the piece about how at BlackRock he had responsibility, exaggerating what the role was there. But the shorting didn't even—it's such a non-issue that it didn't even rise to the level of going into either of their briefs. I would emphasize, and to make life more even for you, Judge Sullivan, you got affirmed in the— That happens once in a while. You got affirmed in the PXRE case. There are many reasons that an executive might resign, most of which are not related to fraud. And just to make it fair to everybody, Judge Livingston and Menasche, you were both on the panel in Rotuno two years ago, which said that corporate executives change positions for any number of reasons other than fraud. There's no there there. I think Mr. Sanchez-Ortega is in this case because he happens to be a U.S. citizen, and plaintiffs only serve U.S. citizens. You need more for Sienta than just being in the U.S. I don't want to take any of Mr. Shammugin's time on the time bar issue. Unless you have questions on my 20A and 9B arguments, I will cede the podium. Thank you. Thank you, Chief Judge Livingston and Your Honors. Ken and Shanmugam of Paul Ice for the underwriter appellees. May it please the court. My clients, of course, are subject only to the Section 11 claim, and the district court correctly concluded that that claim fails for an additional reason. The Section 11 claims here are untimely. Now, there are two components to that argument. The first is that, as the district court correctly concluded, the claims were untimely even at the time of the earlier first amended complaint, to which the claims allegedly related back because appellants were on notice well over a year before the filing of that complaint. Well, on notice of what? Well, they were on notice that they were mischaracterizing debt. Yeah, and I want to go directly to your question to my friend, Mr. Love, because we are certainly not here arguing that simply because reasonably diligent investors should have been on notice that something was wrong, they were on inquiry notice such that they should have conducted an investigation. So how is the characterization of debt, recourse or nonrecourse, directly related to the allegations in the complaint about triangulation and the accounting? I think precisely because it gave rise to concerns that the company was engaging in what plaintiffs themselves describe at paragraph 12 of their complaint as accounting slight of hand. And I would direct the court to what plaintiffs say in that paragraph. They say that the problem that Abengoa sought to conceal was so vast and touched on so many aspects of its business that eventually the fraud was unable to keep it hidden. They go on to cite a Reuters report that the revelation about debt misclassification raised, quote, myriad further questions about how various liabilities are treated on its balance sheet. And they quoted a hedge fund analyst as stating the more they open the door on their financials, the more questions there are. So, Judge Sullivan. So where's the direct relationship? I guess I'm trying to figure that out. Well, the direct relationship is that this disclosure, this series of disclosures about the classification of debt raise concerns about the credibility of Abengoa's financial statements and its accounting practices more generally. And the best evidence of that. You were going to argue this broad point, but it seems that you're really arguing that broad point. Where there's smoke, there's fire. They mischaracterized debt. That led to a massive, you know, shorting of the stock and sell-off. And then you're saying that put everybody on notice that these guys got problems. Our submission was that there was smoke about the general genus of problem, i.e., accounting impropriety. And the reason that that happened. Explain to me the relationship between the debt characterization and this accounting fraud that's alleged. Triangulation. Just start there. Yeah. The step is that it raised concerns about Abengoa's accounting practices more generally. And I recognize that there's always within creed notice going to be. But why would it? Okay. So if they have a weird definition of recourse debt or one that people think is not accurate, why would that lead you to conclude that they actually were putting revenue on the books that didn't exist? Sure. I think because it was so central to the company's financial situation, to its liquidity, and so forth. The non-recourse debt was. Yes. And Judge Benashia, I think the reason why that's the right way to think about inquiry notice here. And I recognize that there's always in some sense going to be a level of generality issue with inquiry notice. Is that the alternative is to say that there had to be disclosures specifically with regard to the percentage of completion method. And I think that really would conflate inquiry notice with actual notice. Well, they're not. Even in August 2015, there's not disclosures specific to the percentage of completion method. It's just that given that they're in that position, it can't be that the numbers on the books about their revenue are accurate. That's the revelation that happens in August 2015. But I'm not sure that that's actually true. And I think your colloquy with my friend Mr. Love about that was really quite telling. I think plaintiff's whole argument with regard to this part of the case, and I do want to turn to relation back as well because I think that may provide a simpler line on this point. But I think on the issue of timeliness, you asked my friend Mr. Love, well, what was it about the August 2015 disclosures that put you on inquiry notice? That is their whole argument here is that that put them on inquiry notice, and conveniently that was just slightly under a year before the filing of the first amended complaint. And the problem for them is that those disclosures arguably are even further afield if you take this view that it's got to be a disclosure with regard to this accounting issue specifically. And that's because those disclosures were simply about the fact that Abengoa was having real challenges as a going concern. Whereas the November 2014 disclosures are about accounting. Yes, there are more in the ballpark. The August 2015 disclosures are about revenue, and the November 2014 disclosures are not. But they weren't really about accounting problems so much as they were just about the fact that the company was suffering from a real lack of capital. And so you will recall that the disclosures – That puts you on notice of the fraud. If they're in that position, then it can't be that the revenue numbers in their books are accurate, right? But not necessarily. I think it could just be evidence that the company was really struggling. In other words, none of those revelations had anything to do with anything relating to accounting. It was the revelations in November of 2014, as again the third amended complaint makes clear, that raised these concerns about, quote, how various liabilities are being treated on its balance sheet. And for purposes of inquiry notice, that is sufficient. And what would a reasonable investor have done in November 2014 to gather enough information to make out a pleading? I would submit, Chief Judge Livingston, that they would have done, presumably, precisely what the plaintiffs did around the time of their third amended complaint. They would have reviewed the publicly available documents. They would have looked for confidential witnesses and the like. And they had a lengthy period of time. Well, most of the documents post dated that accounting. The debt statement, right? Well, but for purposes of making a claim concerning the percentage of completion method. And, of course, keep in mind that. What should they have done? You're saying they would have relied on documents that they relied on when they did their third amended complaint. But most of those documents post date the statements that you're saying put them on inquiry notice. Well, but, of course, their whole claim here, and this brings us neatly to the relation back argument, is that they, in fact, did enough to plead this by the 2016 complaint, the first amended complaint. And so, presumably, what they would have done, again, is what plaintiffs typically do in securities cases, which is to conduct that sort of investigation, talk to former employees, and develop the claim. Because, after all, again, for purposes of this argument, they have to show that they would have been able to bring this claim in a timely fashion in the first amended complaint. Now, all of this discussion is really the flip side of the argument with regard to relation back. And I would submit to the court that, in some sense, the straightest line here to affirm Judge Ramos is simply to say that with regard to these percentage of completion claims, there is not enough in the first amended complaint for relation back. I would note, parenthetically, that, as we explained at some length in our brief, there were the two categories of statements. We haven't heard anything today about the statement concerning enforcing strict discipline at the company. We certainly agree with our colleagues that that statement was not actionable puffery. But that's the one statement, the one alleged misstatement, that was included in the first amended complaint. If you look at the first amended complaint with regard to the percentage of completion. That doesn't have the percentage of completion statement. No. There was the single reference. That statement is part of the same transaction, right? It's in the registration statement. And isn't this just the way amended complaints work, that you come up with a more precise argument as you amend your complaint and review the evidence? I would say two things. First, that I don't think, with respect, that this is how the 15C inquiry works with regard to Securities Act claims. And second, that this is not a case in which the plaintiffs were simply fleshing out an earlier claim of a misstatement in a later amended complaint. So let me say two things about that. Does that mean that, I will let you do that, but does that mean that pointing to any other statement in the registration statement just can never relate back because it's a different misrepresentation? I think what we would say is that the court doesn't have to go that far with regard to the percentage of completion alleged misstatements in the third amended complaint because there are really two problems here. The first problem, as we have alluded to, is that the misstatements on which they're now relying were not identified as misstatements in the first amended complaint. But in addition, the theory of falsity in the earlier complaint in the Securities Act claims, which were, of course, again, the only claims against my clients, was completely different. It was the theory concerning debt misclassification and not a theory concerning accounting improprieties. And if you put those two things together, our submission is it's not the same transaction or occurrence. And when you look at this court's cases and I think other courts— The thing that is the basis of the claim is the misstatement, right? So if they file an initial complaint and it says they made a misrepresentation by saying they have strict financial standards or whatever, and then they say, okay, now we've looked more closely at it and so we're going to amend our complaint. They say, well, actually, the registration statement didn't just say that generally. It also specifically explained what the strict financial standards are. And so we think that that's part of the same misrepresentation about following certain financial standards. Why isn't that an elaboration of the misrepresentation they're originally identifying? I mean I don't think so because I don't think that the strict financial discipline statement was really a statement about the accounting practices. You know, the statement was we have successfully grown our business while seeking to enforce strict financial discipline to maintain our strong liquidity position. Now, I think part of the reason— I thought that it was about accounting practices because as you pointed out, the First Amendment complaint says the reason why that's a misrepresentation is because of the way they characterized debt in their accounting practices. Well, correct, and it really illustrates— So they did think that that was a statement. The allegations were that was a statement about their accounting practices. Well, I would say that this colloquy really illustrates why that statement really shouldn't be actionable, why it should be classified as I think— I get that. That's a different— Yes, but precisely because it's so open-ended that it could be subject to any number of different theories of falsity. And I think with regard to that statement, if that statement were really still part of the case, and again, the plaintiffs don't seem to be pressing it this morning, I think what I would say with regard to that is, you know, the theory of falsity is still different. And when applying the transaction or occurrence test from Rule 15c, I think you've got to look at the nature of the claim. And when you're dealing with a claim like a Securities Act claim, you know, the focus should be on the misstatement and the theory of falsity because after all, you've got to have an alleged misstatement and you've got to have a theory as to why that statement is false or misleading. And I think with regard to the percentage of completion statements, plaintiff's theory here flunks in both regards. As we've been discussing, those misstatements were not alleged in the earlier complaint. Well, perhaps they imported this argument so if they had in fact – which I guess they do. They also still retain the strict financial discipline statement and say that that's false for the additional reason that they engaged in triangulation and the two sets of books and whatever. So that's an additional reason for why the same statement from the original complaint is misleading. Does that relate back or they can't even have a new theory for the same statement? Judge Menasche, I would say that doesn't relate back. It doesn't relate back. And I would say because – Even if it's a claim about the exact same statement as in the first complaint, it still doesn't relate back. No. And I would respectfully dissimulate just slightly. I don't think it's an additional reason. It's an entirely distinct reason. And of course, for a Section 11 claim to go forward, a plaintiff must establish that the statement is false for a particular reason. And so to be sure there, the misstatement was alleged in the earlier complaint. But a defendant in our client's position would not have had adequate notice that the plaintiff's theory of their Section 11 claim was accounting improprieties. And this court has said – The First Amendment complaint says it does talk about maintaining separate books, right? There are the allegations concerning accounting improprieties. But those allegations, as the court will be aware, were contained in an entirely separate part of the complaint on the Exchange Act claims against the other defendants. And so again – Using the separate books is not alleged in the first complaint with respect to the registration statement. With regard to the Securities Act claims, which were and are the only claims that have been brought against my clients. And so I think really what the plaintiffs are left with on the relation back argument is the single reference at page 16 of the supplemental appendix to the percentage of completion. And that reference was not accompanied by any corresponding alleged misstatement. And so in our view, that is insufficient. Again, in the words of this court in Lehman XS, the central inquiry for purposes of relation back is would there have been adequate notice to the defendants about the factual allegations? And an entirely distinct set of factual allegations does not suffice. And I would submit that if this court were to rule otherwise, it would be an exceedingly dangerous precedent for this court to establish precisely because a plaintiff could do what Judge Menasche was suggesting. Essentially to identify a very broad statement in a registration statement and then over time essentially morph their Section 11 claim. And that is precisely what took place here if this court looks at the history of this complaint, which is how we find ourselves now eight years down the road from the filing of the first amended complaint, the first complaint that even brought allegations against my clients. And yet in a context where there is a three-year statute of repose, we have plaintiffs seeking relation back. And so I would submit that, again, if the court doesn't agree with Judge Ramos' reasoning on inquiry notice, that the relation back argument is a very straightforward way of reaching the same result, which is an affirmance of the dismissal of the claims against my clients. Unless the court has any further questions. Thank you very much. I'd like to talk a little bit about what's actually in the first amended complaint, which is allegations that the registration statement made false statements, including about strict financial discipline and misrepresenting- Not percentage of completion. No, but the reason why that statement was false, one of the reasons given for why that statement was false was because of the inaccurate percentages of completion. So strict financial discipline is enough to get you anywhere you need to go. I mean, that's a pretty broad statement. No, no. The statement seeking to enforce strict financial discipline and existing liquidity and cash flow were found to be-were alleged to be inaccurate for reasons- Liquidity and cash flow will be sufficient for the foreseeable future. That's basically what they said, right? And the reason why these statements in the registration statement were false, one of the reasons was because of the company using erroneous financial reports that overstated the value of certain projects by showing inaccurate percentages of completion on some projects. And for the statute of repose, all that's required is adequate notice that gives the party- give them aware-make them aware of the general fact situation in the original pleading. And so the percentage of completion inaccuracies that are alleged in this part of the complaint are fleshed out in another part of the complaint. The exchange act. In the first amendment complaint, talking about the- What about the argument that the underwriter defendants wouldn't have noticed that that was the basis of the claim against them because you put it under the heading of the exchange? Well, it sort of fleshes out what was said in the allegation in the first part, and it's not a very long pleading, and it seems like the underwriters would be able to review the pleading. The underwriters should have understood that even though you asserted falsity under the Securities Act on a certain theory, they should have understood that you could apply the allegations under the Exchange Act to bolster that claim. That the facts there certainly were relevant to the facts in the Securities Act claim. And that, as the court said- Do you think what you've done is provided an additional reason for why the original misstatements that you were focused on were false, or do you have a different kind of claim of misrepresentation? I'm sorry? I mean, we had this discussion about whether it's fleshing out the arguments for why the registration statement contained a misrepresentation, or it's a totally different theory of misrepresentation, and I guess you heard the argument for it being different. I guess I'd like you to explain why you might think that it's the kind of normal fleshing out or elaboration that happens in an amendment of a complaint. I mean, it certainly is fleshing it out. It's describing it in more detail why the percentage of completion tied more to that misstatement, but it's the same conduct of using recording costs improperly to advance the stage of proceedings in order to recognize revenue. And so it's the same- I mean, as the district court said at SA-129, the claims regarding accounting policies are new and alleged, although sparingly, in the earlier complaints, and so I think it was alleged with enough notice- The district court thinks that the accounting improprieties were in the first complaint. Were in them, and then with more detail provided as- Although accounting improprieties is at a certain level of generality, right? So the original complaint did focus on the characterization of the debt, whereas you're talking about different accounting improprieties later. Is that enough, that it's all accounting improprieties? What the district court was talking about here was the allocations in the second amendment. It's kind of interesting. So, like, on the one hand, you're saying it's all accounting improprieties, and so there's going to be relation back. On the other hand, you're saying even though we were on notice of a certain accounting impropriety in November 2014, we wouldn't have been on notice of this accounting impropriety. I mean, isn't there a tension there about- On the one hand, you're saying the accounting improprieties are very different. On the other hand, you're saying they all just relate to the same transaction. I don't think so. I mean, the fact that there are statements, you know, from November 2014 that were not directly related to the accounting improprieties we allege later is different than whether or not there was enough information in the first amendment complaint to give defendants a general idea. Defendants should have known that talking about the accounting impropriety of the mischaracterization of the debt could lead to a claim based on the two sets of books or the triangulation, right? I'm not saying that. What I'm saying is that because the first amendment complaint also talks about not just debt misclassification, but it has enough in there to provide notice about the percentage of completion and using financial reports that overstated the value of certain projects by showing inaccurate percentages. I'll ask it this way. So if, in fact, the first complaint was- Let's say we put aside what's under the Exchange Act heading because we agree with an argument that maybe the defendants against whom only the Securities Act claim is asserted should be focused on that. So if, in fact, your initial claim were only about the mischaracterization of debt and then you filed a new complaint that added the rationale for triangulation and the two sets of books and other things like that, would that relate back? I think then I would be arguing that the entire registration statement counts, but I don't think we have to do that because I think here there is enough in the first amendment complaint that talks specifically about- Sorry, you would be arguing what? That the entire registration statement counts? That it was a claim about the registration statement and so therefore you can add additional claims because it's all part of the same transaction. But I don't think I have to make- Is the transaction the registration statement or is the transaction the misrepresentation within the registration statement? I think the transact- First of all, I don't think I have to go that far because I think here there is enough in the first amendment complaint about the specific improprieties and especially if you look at the entire pleading, it's even more fleshed out. But even in the Securities Act part, there is. But I think the transaction is, yes, the occurrence is the offering and the registration statement. But again, I don't think I have to go that far. So if you had an amended complaint that picked out some other statement within the registration statement that had nothing to do with accounting improprieties or debt mischaracterization or anything, that would still relate back because it's all about the registration statement. I think it would be a harder argument for sure. I think defendants need to have, you know, be aware of the general facts situation. Whether that's too general or not, I'm glad I don't have to necessarily make that argument because here I think there's enough information. Since we're talking about the similarities between accounting irregularities, I'd like you to respond to the argument that if- Since you said earlier that knowing about the mischaracterization of debt wouldn't put you on notice about other kinds of accounting irregularities. In fact, the August 2015 state disclosures were not about accounting irregularities at all. They were just about the financial position of the company. So why wouldn't the November 2014 disclosures be more likely to put you on notice about the accounting irregularities? Because they were solely about debt misclassifications. And I'm not sure we have to- I think it's on its defendant's burden to show that upon inquiry notice we would have been able to find this information in a more timely manner. I don't think we have to show that in fact the November 15th is necessarily what triggers our duty to inquire. The what is what triggers? Whether the 8-15 disclosure is the trigger. I mean, I'm not sure there was a trigger. I think there was enough of a, I guess, perhaps storm warning where we began investigating and finding this information. But I'm not sure we have to- I think as long as we can demonstrate that the November 14th disclosure was not a trigger, then we're within the statute of limitations. And it's not a trigger because you would have been focused on debt mischaracterization and it wouldn't necessarily imply that there were other accounting irregularities. Is that your position? Right. And the idea that, yes. Okay. Can I ask you just, with your permission, just to respond to the point about the 28-J letters and the civil court's conclusion. So the argument is that this KPMG report is on thin ice to begin with because nobody has a copy of the full report. It's just sort of excerpted or- Which I find odd given that it haven't gone on commission yet. But yes, Your Honor. Well, all right. But anyway, it's not part of the pleadings other than what's been cited by the Spanish courts, right? Right. From a news report that described it. Okay. But now we have the Spanish court, or a Spanish court, finding that even that is not enough to trigger liability, right? Criminal liability in that case. Yeah. So, I mean, is that the key distinction? Because criminal liability, the standards are higher? Well, that's certainly a distinction. But still, what the court there did, as we said in our response to the 28-J letter, it weighed two expert reports, decided one was credible and one wasn't. I mean, that's a classic kind of credibility fact-finding issue. And we're at the pleading stage here. And so that doesn't undermine, again, and didn't dispute what the KPMG report said that we allege about the invoice triangulation. And those are facts that an auditing firm found that we're permitted to use in our complaints, especially when it overlaps with other witnesses' descriptions. Right. But, I mean, it has been called into question, at least. Sure. And so, I mean, when a consent decree after an SEC complaint is not enough to make the allegations in the SEC complaint something that can be relied on, wouldn't this be even worse, where there's been a finding of no liability? Well, again, it's a different burden. It's Spanish laws. I mean, I think what we can focus on is the content. But a consent decree is sort of closer to an admission of misconduct, it would seem to be, right? I mean, the consent decree, I mean, there are other issues there in terms of whether it can be considered. Well, it may be, but it seems to be dismissal, consent decree. You'd rather generally have the consent decree if you're trying to rely on the documents that are underlying the allegations. Wouldn't you agree with that, at least? I'm sorry. Say that again? Never mind. Okay. Thanks. Okay. Thank you, Eric. Thank you all, and we'll take the matter under advisement. Well argued.